**Angela JACKSON; Shaprell Williams; Prenecia Brooks; and Jeremiah Jackson, by next friend Angela Jackson,**

**v.**

**Joyce F. JACOBS, individually and in her official capacity as Executive Director of the Housing Authority of the City of Jonesboro, Georgia; and The Housing Authority of the City of Jonesboro, Georgia.**

**Civil No. 1:97–cv–1454–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 17, 1997.

Dennis Goldstein, Louis Paul Owens, III, Atlanta Legal Aid Society, Atlanta, GA, for Plaintiffs.

Darrel Lee Hopson, Office of Darrel L. Hopson, Jonesboro, GA, for Defendants.

### ORDER

ORINDA D. EVANS, District Judge.

This civil action alleges violations of 42 U.S.C. § 1983, federal Housing and Urban Development ("HUD") regulations, 24 C.F.R.

Parts 882 and 982, the United States Constitution, the Georgia Constitution, and the Section 8 Administrative Plan of the Housing Authority of the City of Jonesboro. Plaintiff seeks a declaratory judgment, compensatory damages, and injunctive relief. The case is currently before the court on Plaintiffs' motion for a preliminary injunction. Defendants have filed a response in opposition to Plaintiffs' motion.

On June 5, 1997, this court denied Plaintiffs' motion for a temporary restraining order and directed the parties to appear at an expedited preliminary injunction hearing on June 13, 1997. A hearing was held, at which time the parties presented the testimony of witnesses, documentary evidence and arguments through counsel. At that time the parties also, pursuant to the court's order, submitted proposed findings of fact and conclusions of law and a joint factual stipulation.

The court makes the following findings of fact and conclusions of law:

### Facts

Until February 1997, Plaintiff Angela Jackson was a participant in HUD's Section 8 housing assistance program, administered through the Housing Authority of the City of Jonesboro ("JHA"). From 1992 through December 1996, Jackson, along with her minor niece and two minor children, resided in an apartment at 5271 West Fayetteville Road in College Park, Georgia, known as Westcove Apartments. A substantial portion of her rent was paid by JHA pursuant to a housing assistance payment contract ("HAP contract") between JHA and Westcove.

As required by HUD regulations, Jackson had executed a written lease with Westcove. According to its terms, Jackson's lease began in September 1995 and was to terminate on August 31, 1996. However, under the terms of a lease addendum, the term of the lease was specified to begin on September 1, 1995 and to continue until termination (1) by the landlord, in accordance with the provisions of the addendum (basically restricting the landlord's termination right to "good cause"); (2)

by the tenant, either (a) after the first year of the lease, through written notice to the landlord and to the housing authority, or (b) by mutual agreement between the landlord and the tenant; or (3) by the housing authority, through termination of the HAP contract.

The lease addendum specifies that, in the event of any conflict between the terms of the addendum and the lease, the terms of the addendum prevail.

In August of 1996, Jackson notified the JHA that she desired to move to DeKalb County on September 1, 1996. Jackson requested that her certificate of eligibility (as a Section 8 participant) be transferred to the Decatur Housing Authority. On August 16, 1996, Jackson signed a transfer request form which requested that her documents be sent to the Decatur Housing Authority. That form was approved and signed by Angie Johnson, Jackson's JHA caseworker. On August 20, JHA sent a portability form along with Jackson's Section 8 certificate to the Decatur Housing Authority.

Jackson attempted repeatedly with little success to contact personnel at the Decatur Housing Authority in an effort to arrange for her transfer. She also looked for suitable housing in DeKalb County, unsuccessfully. In the meantime, Jackson contacted Joyce Jacobs, Executive Director of JHA, regarding remaining at Westcove while she was trying to find housing in DeKalb County. Jacobs orally stated that she would extend Jackson another 30 days, i.e., until September 30, 1996. Jacobs testified that this was an extension of the Westcove lease and an extension of Jackson's Section 8 certificate. Westcove acquiesced in the extension. On September 25, Jackson wrote a letter to Jacobs, informing her that she had not yet secured housing in DeKalb.[1] On September 27, Jackson wrote a letter to the Decatur Housing Authority, stating that she had decided to remain in Clayton County and requesting that her paperwork be transferred back to JHA.[2]

Jackson telephoned Jacobs on October 3, telling her that she wanted to remain at

---

1. This letter was received by JHA on September 27, 1996.

2. This letter was sent via fax on September 30, 1996.

Westcove. Jacobs suggested that she call Joy Register, resident manager at Westcove. On October 3, Jackson called Register, who said it would be "fine" for Jackson to remain.

On October 3, JHA gave Jackson a new Section 8 certificate and also papers for a new lease, lease addendum, and HAP contract from JHA with instructions to get them signed. Jackson took these papers to Joy Register on October 3 and left them with Register.

On October 18, 1996, Jackson returned the completed paperwork to JHA.[3] The new lease was dated October 16, 1996 and specified its term to begin on October 18, 1996.

JHA made a HAP payment of $207.00 to Westcove, representing its portion of Jackson's October rent, prorated to cover the period between October 18th and 31st. Westcove informed Jackson that she alone was responsible for all rent accruing from October 1st through 17th, a total of $273.00. Jackson had never been specifically informed that JHA would be stopping its payments to Westcove at the end of September. In October and November, Jackson made payments totalling $200.00 but could not pay the additional $73.[4]

On December 6, 1996, Westcove's owner filed a dispossessory warrant against Jackson in the Magistrate Court of Clayton County, Georgia, on grounds of unpaid rent.[5] On December 30, 1996, judgment was entered against Jackson, citing an arrearage of $217. This total apparently reflects the unpaid $73, $2 each for rents from September and De-

cember, two $20 late fees, and a $100 warrant fee.

Jackson immediately contacted JHA to request the documents required to secure housing elsewhere. However, on December 31, 1996, JHA sent Jackson a letter stating that her housing assistance eligibility under Section 8 would be terminated effective February 1, 1997 on account of her failure to pay rent to Westcove.

A hearing was held at Jackson's request at the Housing Authority on January 8, 1997.[6] A letter dated January 9, 1997 to Ms. Jackson from JHA reflects JHA's decision to terminate her participation in the Section 8 program effective February 1, 1997 and that this action was being taken due to her eviction for nonpayment of rent. On or about January 10, 1997, Jackson and her family moved out of Westcove.

The instant action was filed on May 20, 1997. Plaintiffs seek an order determining that Defendants had no right to terminate Jackson's participation in the Section 8 housing program and ordering her reinstated. Plaintiff states that she and her family are presently homeless, and that she has been residing alternatively with relatives and in homeless shelters.

### Legal Standard

In order to secure a preliminary injunction, a party must convince the court 1) that there is a substantial likelihood that she will succeed on the merits of her case; 2) that there exists a substantial threat of irreparable injury to her if the injunction were to be

---

3. The parties differ in their explanations of the two-week lapse between Jackson's obtaining the paperwork and returning it to JHA. In her oral testimony, Jackson claimed that, at the time she took the paperwork to Ms. Register for Westcove to complete, Ms. Register told her that she was going to be out of town for the next week. Jackson appears to contend that she assumed her paperwork would not be available until after Ms. Register had returned, which explains why she did not retrieve and return it to JHA sooner. Ms. Register, on the other hand, testified that she was not out of town at all during the month of October.

4. In order to procure the $200, Jackson worked three odd jobs and borrowed $100 from her

church. During the period leading up to these events, Jackson did not have regular employment. Her monthly rental contribution as fixed by JHA was $2 per month.

5. In November 1996, Westcove had been sold to Chastain Properties, which, according to a resident manager's memo, had begun commencing eviction proceedings against all tenants whose rents were in arrears.

6. The parties differ in their accounts of precisely what transpired at the hearing, particularly with respect to whether Jackson expressed the desire to present a witness on her own behalf and whether Jackson was given the opportunity to explain the arrearage.

denied; 3) that the threatened injury outweighs the harm an injunction may cause to her opponent; and 4) that the granting of an injunction would not disserve the public interest. *Nnadi v. Richter,* 976 F.2d 682, 690 (11th Cir.1992) (citations omitted).

## Discussion

Based upon the evidence which has been submitted to date, the court finds that Plaintiffs have satisfied all four requisites for preliminary relief and are entitled to a preliminary injunction.

### Likelihood of Success on the Merits

The fundamental legal issue in this case relates to the legality of JHA's January 1997 decision to terminate Ms. Jackson's participation in the Section 8 program. Based on a preliminary evaluation of the relevant Housing and Urban Development regulations; the terms of Jackson's lease and lease addendum; the terms of the HAP contract between JHA and Westcove; and JHA's own Administrative Plan, the court finds that JHA acted unlawfully in terminating Jackson's Section 8 assistance.

JHA's decision to terminate Jackson was, according to its December 31 letter, due to its finding of Jackson's "violation of program rules on obligations of the family." The letter cites Jackson's eviction for non-payment of rent and goes on to say that "[p]rogram rules state that families must pay their portion of rent on a timely basis." Thus, Jackson's termination from the Section 8 program stemmed directly from her failure to pay the full $273 of October rent which was not subsidized by JHA.

■ The court finds that JHA acted unlawfully in failing to cover Jackson's rent for October 1 through 17 and thus the arrearage which was the basis for Jackson's eviction stemmed not from a default by Jackson but by JHA. This conclusion rests upon the finding that Jackson's September 1995 lease with Westcove actually continued to be effective until the October 16, 1996 lease took effect.

Under the regulations and by its own terms, a HAP contract [7] is effective until the corresponding lease expires. *See* 24 C.F.R. § 982.451(b)(2) (1996). Thus, a housing authority is bound to continue making payments to a participant's landlord until that participant's lease has been terminated. On the face of Ms. Jackson's 1995 lease with Westcove, her tenancy was to expire on August 31, 1995, but according to the provisions of the lease addendum, the terms of the lease "shall continue" until one of a number of affirmative acts is taken by the landlord, tenant, or housing authority.[8] As mentioned above, the lease addendum states that "[i]n case of any conflict between the provisions of this section of the Lease and any other provisions of the Lease, the provisions of this section shall prevail."

One must conclude, then, that Jackson's lease did not expire on August 31, 1996. This fact would comport with HUD's regulations regarding Section 8 leases, which state in relevant part that "[t]he lease must provide for automatic renewal after the initial term of the lease," 24 C.F.R. § 982.309(b)(2). While Defendant Jacobs testified that it is the policy of JHA to require every participant to execute a new lease every year, this policy appears to violate the above-quoted regulation and thus Ms. Jackson's failure to comply with this policy should not be held against her.[9]

---

7. The HAP contract is a standard form contract which incorporates HUD's regulatory requirements. The form of the HAP contract was revised in September 1995. The HAP contract signed in conjunction with Ms. Jackson's 1995 lease was apparently the old form. (Pls.' Br. Supp. Prelim. Inj. at 6–7, n. 2) Thus, all references to the HAP contract herein are meant to refer to the old form.

8. The court has already recited the HAP contract's specific provisions in this regard. It should be noted that the lease addendum sub-

stantially incorporates HUD regulations regarding termination of the lease. *See* 24 C.F.R. § 982.309(b)(3).

9. In addition, this policy appears implicitly to contradict the terms of the HAP contract, which refers to its own "anniversary date." As the term "anniversary" connotes a relationship which continues uninterrupted from year to year, one must conclude that the HAP contract is designed to operate in such a manner. If the HAP contract is supposed to be coterminous with the lease, then one must also conclude that, in

If it is true that the lease did not expire automatically on August 31, 1996, then JHA must argue that the lease was terminated by an affirmative act as specified in the lease addendum. To reiterate, the lease addendum provides that the lease may be terminated, under certain circumstances and in accordance with particular requirements, by the landlord, the tenant, or the housing authority. Defendants do not argue, as indeed they have no grounds upon which to do so, that Westcove attempted to terminate its lease with Jackson in August or September of 1996, and thus this ground for termination is inapplicable.

More contentious is the issue of whether Jackson herself, in securing transfer documents, effectively terminated her lease. As discussed above, the lease addendum provides that tenants may terminate their leases either unilaterally, through written notice to the landlord and housing authority, or mutually, through agreement with the landlord. JHA's own Administrative Plan is slightly more specific with regard to what is required of tenants who wish to terminate their leases. The Plan states that tenants desiring to terminate unilaterally must, at least thirty days in advance, provide JHA with a written "Notice to Vacate."

The record reveals that Jackson did not terminate her lease. Jackson did not unilaterally terminate her lease because she never provided any written notice to JHA or Westcove regarding her intention to do so. Defendants, in their Response to Plaintiffs' Supplemental Submission, readily admit that "there is no written notice of termination by Ms. Jackson to Westcove." Defendants argue, however, that because neither federal regulations nor state law requires written notice by the tenant, Jackson's verbal communications with Westcove regarding her intent to transfer suffice to meet the notice requirements. JHA wholly fails to address the fact that its own written notice requirement was not met, apparently concluding that it can choose to enforce its own rules selectively and only when they work in JHA's favor.[10] Moreover, JHA is simply wrong in asserting that HUD regulations do not require written notice; to the contrary, they state that "[i]f the family terminates the lease on notice to the owner, the family must give the [housing authority] a copy of the notice of termination at the same time," 24 C.F.R. § 982.309(d)(2).

The evidence does not show that there was a mutual rescission. There was no written mutual rescission. JHA's contention that the transfer documents satisfied the written notice requirement cannot prevail for the simple reason that the transfer documents were signed only by Ms. Jackson and JHA's Angie Johnson; as Westcove had nothing to do with the transfer documents—and may well never have seen them—they can hardly be characterized as representing a "mutual rescission" between Jackson and Westcove. In addition, the court cannot overlook Ms. Jackson's continued, uninterrupted tenancy at Westcove throughout September and October of 1996. If the lease truly had been mutually rescinded, Westcove would not have allowed Jackson to remain and would not have so readily agreed to let Jackson stay beyond October 3.

Therefore, given that Ms. Jackson's lease neither automatically expired nor was affirmatively terminated, the court concludes that the lease remained in effect until it was superseded by the October 16, 1996 lease. Since a HAP contract remains enforceable as long as its corresponding lease is valid, JHA remained bound to make housing assistance payments to Westcove on Jackson's behalf at least through December 1996 and thus was obligated to make the $273 payment for October 1 through 17.

Given that the $273 payment was actually the responsibility of JHA and not Jackson, Westcove was not authorized to evict Jackson. HUD regulations specifically state that "[t]he family is not responsible for payment

---

the absence of an intervening affirmative act, the lease is also designed to continue unabated from year to year.

**10.** Indeed, Ms. Jacobs on cross-examination admitted that JHA routinely fails to follow the written notice provisions of the Administrative Plan, apparently on the theory that the transfer documents, notwithstanding that they do not take the form of a "Notice to Vacate," suffice as written notice.

of the portion of the rent to owner covered by the housing assistance payment under the HAP contract between the owner and the [housing authority]" and that "the owner may not terminate the tenancy of the family for nonpayment of the [housing authority's] housing assistance payment." 24 C.F.R. § 982.310(b). Given that Westcove was not authorized to evict Jackson, JHA had no grounds upon which to terminate Jackson's Section 8 assistance.

For these reasons, the court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim.

### *Irreparable Injury*

■ That irreparable injury would occur in the event an injunction is denied can hardly be gainsaid. Jackson and her family have been homeless for the past six months and will continue to be without shelter unless their Section 8 assistance is restored.[11] Other courts have held that loss of subsidized housing constitutes "irreparable injury" justifying injunctive relief. *See Basham v. Freda*, 805 F.Supp. 930, 932 (M.D.Fla.1992), *aff'd*, 985 F.2d 579 (11th Cir.1993). Jackson has satisfied her burden of showing a substantial likelihood of irreparable injury.

### *Injury to Plaintiff Outweighs Harm to Defendant*

It would be difficult to argue that the modest amount of money and administrative inconvenience a preliminary injunction would cost the Defendants outweighs the injury Jackson would suffer if she were compelled to remain homeless. *See Basham*, 805 F.Supp. at 932. The court thus finds that Plaintiff has satisfied her burden in this regard.

11. Ms. Jackson testified that because of the outstanding judgment against her, she has been unable to secure any other affordable housing.

12. As Defendants have stipulated that JHA has sufficient funds in its Section 8 program to accommodate Ms. Jackson's needs, there should be no question as to the appropriateness of this relief.

### *Public Interest*

According to HUD regulations, the goal of the Section 8 program is to assist low-income families in obtaining decent, safe, and sanitary housing. *See* 24 C.F.R. § 982.1(a). In light its worthy purpose, it seems entirely reasonable to construe the program liberally in favor of those whom it seeks to serve. Surely the public interest would not be disserved by granting an injunction which would restore a roof over the heads of a family whose greatest transgression was a failed attempt to move to another county.

### *Relief Granted*

For all the foregoing reasons, the court grants Plaintiffs' motion for a preliminary injunction. Defendants are ORDERED instanter to restore Ms. Jackson's Section 8 assistance, issue her a new Section 8 certificate, and assist her in finding housing.[12] Defendants are further ORDERED, in the period before Ms. Jackson moves into the new housing, to use funds from its ACC reserve account or administrative fee reserve to secure temporary housing for her family.[13] In the court's discretion, no bond will be required.

Accordingly, Plaintiffs' motion for a preliminary injunction is hereby GRANTED.

13. HUD regulations require all housing authorities to maintain such accounts. 24 C.F.R. § 982.154 & .155. Plaintiffs have submitted evidence from a prior action before this court which indicates that JHA is authorized to use funds from these accounts for the purpose of accommodating those who have been wrongly denied benefits, and Defendants have failed to refute this evidence.